UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:22-CR-22-PPS-JPK |
| | ) | |
| MICHAEL A. DAVIS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Michael Davis was arrested on a roadside in Gary, Indiana on a state charge of intimidation, and in the process, a gun was recovered from his car. He was later charged in this court with being a felon in possession of a firearm. [DE 12.] Davis now seeks the suppression of the firearm and any statement he made after he was arrested as fruits of the poisonous tree. [DE 34.] His motion must be denied for a number of reasons: the seizure of the firearm was done incident to a lawful arrest supported by probable cause, was obtained under the Fourth Amendment's automobile exception, and would have been inevitably discovered anyway in a later inventory search. The motion to suppress will therefore be DENIED.

### Background

Over two days, I conducted an evidentiary hearing on Davis' motion, where seven witnesses testified. Based on the evidence presented at the hearing, I find the following relevant facts by a preponderance of the evidence, which is the burden of proof applicable to suppression hearings. *United States v. Matlock*, 415 U.S. 164, 177 n.14

(1974).

Early in the morning hours of February 22, 2022, around 1 or 2:00 a.m., defendant Michael Davis showed up at Ariel Carter's house in Gary. [DE 62, 8/18/22 Hrg. Trans., at 21.] The two had an on-and-off relationship for about 15 years; they had several children together, and Carter was pregnant at the time. [*Id.* at 20, 49.] Ms. Carter testified that she was awakened by Davis beating and kicking her front door. [*Id.* at 21, 24, 56.] Carter was fearful of Davis who had previously threatened Carter's unborn child in a text message. [*Id.* at 27, 49.] Davis was there that morning because he had left some clothes in the rear of Carter's van, and he wanted them back. [*Id.* at 21-22.] But Carter wouldn't give him his clothes until Davis returned a necklace to her. [*Id.* at 22.] Davis was standing outside her house during this dispute, and at some point during the encounter, Davis picked up a brick in a threatening manner causing Carter to worry he was going to damage her van. [*Id.* at 23-24.] So she called the police. [*Id.* at 23.]

Davis was back in his car by the time the police arrived. [*Id.* at 24.] Carter asked the police if they could be there for a "property exchange" — the clothes for the necklace. *Id.* Carter was frustrated by the officer's response; he told her she was going to have to file an online report. [*Id.* at 24-25.] The officer then left the area and Carter retreated into her home. But about five hours later, Davis returned to again attempt to retrieve his clothes. By now it was around 7:00 a.m. [*Id.* at 26.] Because of the threats Davis had made to her, Carter instructed her kids to call the police if Davis came to the

2

house. [DE 62 at 27.] Pursuant to that instruction, when Davis showed up at the house that morning, Carter's 15 year old daughter called 911. The call was placed at 7:13 a.m. [*Id.* at 26-27; DE 34-1 at 14.] (Carter was in the shower when Davis first reappeared at the home and that is why it was the daughter who placed the call.) [DE 62 at 26-27.]

According to Mr. Josleyn, the public safety operator who answered the 911 call, the caller told him "there's a man here and he's trying to kill us," and she gave their address. [DE 61, 8/16/22 Hrg. Trans., at 18.] I listened to this 911 call in court. [Govt. Ex. 1.] The caller appeared frightened, and one could hear the emotion and distress in her voice. She identified herself and her location, and told the 911 operator to please hurry, and that Davis had a gun and he threatened her mother. [*Id.* at 18-20.] She further said that he was there earlier, he was threatening her mother saying he was going to kill her, and he had an assault rifle in the car. [*Id.* at 22-23.] When asked if she or anyone else was in danger, the caller answered "yes." [*Id.* at 25-26.] The 911 dispatcher entered these notes into the CAD system (which is a computer system that transmits notes to officers), and marked the call as "urgent." [*Id.* at 15, 27; DE 34-1 at 14.] The notes state "verbal domestic disturbance" and "male threatening to kill them, ML is outside, assault rifle in car." [DE 34-1 at 14.] The caller identified Davis' car as a tan GMC Terrain SUV, and that detail is included in the CAD report as well. [*Id.* at 15.]

At one point near the end of the conversation, Carter's voice is heard in the background, and she complains that the police had responded earlier in the night, but didn't do anything. [DE 61 at 28-29.] The caller (Carter's daughter) told the 911

3

operator that they couldn't wait anymore, and they were leaving the house. [*Id.* at 30.] She told the operator they were going to the Gary police station, and the operator told her he would have an officer meet her there.

In the meantime, Sandra Minchuk, the Lake County 911 dispatcher, dispatched officers to Carter's house in response to the 911 call. [*Id.* at 40.] At the hearing, I heard the recording of the radio traffic. The dispatcher said the person threatened to kill a pregnant female and apparently has an assault rifle in the car. [Hrg. Govt. Ex. 3.]

Carter testified that after she left her house heading for the police department with her four kids in the van, Davis texted he was in her house. [DE 62 at 29-30.] So she turned around at that point. *Id.* Just about a block from her house, Carter saw an unmarked police car and she blew her horn to get the police officer's attention. [*Id.* at 31, 34.] It is somewhat unclear whether Davis was following her at the time, but at some point, Carter and Davis passed each other on the road, Davis also blew his horn, and they both pulled over when they saw the police officer. [*Id.* at 31-32, 65.]

Sgt. Manuel was the first officer on the scene. He had heard the 911 dispatcher and gotten the CAD notes on his computer inside his vehicle. [DE 61 at 46-51.] When he got to the house, no one was there. [*Id.* at 53-54, 72-73.] But after leaving, he came across Carter on the road who alerted him she needed help. [*Id.* at 54.] Manuel believed Davis was the suspect and his car matched the description the caller gave during the 911 call. [*Id.* at 56.] After patting Davis down, Manuel called for assistance. *Id.* According to the CAD notes, Manuel called for assistance at 7:25 a.m. [DE 34-1 at 15.]

Manuel placed handcuffs on Davis while Davis was standing outside his vehicle. [DE 61 at 57.] At some point, Davis became combative — yelling and screaming at Manuel. [*Id.* at 62.]

When Officer Vonbank arrived, Davis was being boisterous — he was continuing to yell and scream. [*Id.* at 60, 105.] Vonbank went to speak with Carter, who was sitting in her car. [*Id.* at 106, 123.] Carter advised she was being threatened, that Davis had shown up earlier in the night trying to kick the door in and had made threats of hurting her and her unborn baby. [*Id.* at 103-04.] She was scared. [*Id.* at 104.] Then, Davis came back to the house again, and tried to enter her home again. *Id.* Carter knew Davis had a gun in the car. *Id.* Carter herself testified at the hearing that she told Officer VonBank that Davis had threatened to kill her baby. [DE 62 at 43-44.]

There is a conflict in the evidence over the timing of these matters. According to Officer Vonbank, after he talked to Carter, Davis was already being taken to the station. [DE 61 at 106.] But according to Manuel, he didn't arrest Davis until after Vonbank talked to the victim and Vonbank reported to Manuel that Carter wanted to press charges. [*Id.* at 61, 86, 90-91.] Regardless of the exact timing of the arrest in comparison to talking with Carter, Davis was detained in handcuffs and arrested at the roadside stop for intimidation and resisting/disorderly conduct. [DE 34-1 at 12.] The arrest happened somewhere around the time of 7:30 - 7:34 a.m. [*Id.* at 15.]

After he arrested Davis, Manuel searched the car. When Manuel opened the rear passenger door of Davis' vehicle, he found a gun underneath clothing in the foot well of

5

the back seat. [DE 61 at 61-62.]

Agent Cannon went to the Gary Police Department on February 22, 2022, and interviewed Davis later that same day. [DE 62 at 6.] At the beginning of the interview, Cannon read Davis his *Miranda* rights, and Davis signed the waiver. [*Id.* at 6-9.] Davis then said he had purchased the firearm off the street about a week earlier, and described the kind of weapon that it was. [*Id.* at 11-12.] About three days later, continuing his investigation, Cannon spoke with Carter. [*Id.* at 14.] She told him she was staying at a shelter because she was scared to be at the house because of the incident with Davis. *Id.* She was afraid to go back to her house if Davis was getting out of custody. [*Id.* at 14-15, 52.]

## Discussion

Davis is charged with being a felon in unlawful possession of the firearm found in his car, in violation of 18 U.S.C. § 922(g)(1). [DE 12.] He moves for the suppression of the key piece of physical evidence against him — the firearm seized from his car.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. Amend. IV. That same amendment also prohibits a warrantless search unless it falls under one of the recognized exceptions to the warrant requirement. *United States v. Denney*, 771 F.2d 318, 320 (7th Cir. 1985). "If a search or seizure violates the Fourth Amendment, courts will exclude evidence gained from that violation in judicial proceedings against the person injured." *United States v. Rodriguez-Escalera*, 884

F.3d 661, 667 (7th Cir. 2018).

One of those exceptions is the "automobile exception," which "allows law enforcement to conduct a warrantless search of a vehicle if there is probable cause to believe the vehicle contains contraband or evidence of a crime." *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010); *see also United States v. Kizart*, 967 F.3d 693, 695 (7th Cir. 2020). Another exception is the "search incident to arrest" theory. As noted by the Seventh Circuit, searches predicated on a search incident to arrest theory and those predicated on the automobile exception "are interrelated, but not identical." *United States v. Edwards*, 769 F.3d 509, 514 (7th Cir. 2014). "The suspicion required for a vehicle search incident to arrest . . . is keyed to the offense of the arrest; the automobile exception is not tied to an arrest." *Id.*

Under *Arizona v. Gant*, 556 U.S. 332, 335 (2009), a search of a vehicle incident to an arrest is permitted when "it is reasonable to believe the vehicle contains evidence of the offense of arrest." By contrast, the automobile exception requires probable cause that the vehicle contains evidence of criminal activity. *Edwards*, 769 F.3d at 514. Under the automobile exception, "where there is probable cause to believe that a vehicle contains contraband or evidence of a crime, law enforcement may conduct a warrantless search of the vehicle." *United States v. Zahursky*, 580 F.3d 515, 521 (7th Cir. 2009).

Davis makes several arguments for suppression of the evidence that resulted from the roadside encounter, but they all boil down to this: Sgt. Manuel didn't have

7

probable cause to detain or arrest Davis. I disagree. Given the information known by Sgt. Manuel at the time of the encounter with Davis, I find there was plainly probable cause to detain and arrest Davis for the crime of intimidation, and the subsequent search of his vehicle was lawful.

In looking at the initial stop, when an officer makes a stop and detains a person, that alone constitutes a "seizure" of "persons" under the Fourth Amendment, and must therefore be reasonable. *Whren v. United States*, 517 U.S. 806, 810 (1996). In this case, there are plenty of facts establishing that the stop was reasonable. Carter's daughter called 911, gave chilling details about Davis threatening her mother's unborn baby, told the operator she feared for her safety because Davis was outside with an assault rifle in his car, and gave a detailed description of the tan GMC Terrain that Davis was driving. [DE 34-1 at 1.] Manuel knew this information (which was communicated to him over the radio and via his car computer), and was aware of Davis' threats and the allegation that he had an assault rifle in his vehicle. [DE 61 at 53.] What's more, when Carter passed Officer Manuel on the street, she honked her horn to get his attention, gestured as to flag him down, and Manuel saw Davis' car pull over too, which matched the description of his vehicle. [DE 61 at 54, DE 62 at 34.] When Carter pulled up to the officer, she told him, "I need assistance." [DE 62 at 32.] The cars pulled over just a block or so from Carter's house. [DE 62 at 32-33.]

This all added up to probable cause to detain Davis. Manuel came across Davis and Carter on 7th Avenue less than 10 minutes after the 911 call ended. The 911 call

8

conveyed Davis' threats, the fact that he had a gun in the car, and contained identifying information about Davis, the vehicle he was driving, and their location. Carter actually honked her horn at the police officer to get his attention, and then told him she needed help. What would a reasonable police officer do at this point other than pull over and detain Manuel? It is inconceivable that an officer would have just driven by the two, ignored Carter's request for help, and gone on his merry way. It was also reasonable to quickly place Davis in handcuffs since Manuel suspected a weapon was in his car.

Probable cause can exist based on a corroborated 911 call. That's what the Seventh Circuit held in *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015). In *Charles*, in a road rage incident, a 911 call was placed that a man was violently banging on another motorist's window and had a gun. [*Id.* at 858.] A description of the man was provided. *Id.* When the police arrived they saw a man matching the description previously given in the 911 call, and he was exiting a nearby car. *Id.* The Seventh Circuit found that this was sufficient probable cause to arrest the defendant and search the car that he had just exited. [*Id.* at 860-61.]

The same is true here. After Sgt. Manuel confirmed some of the details from the 911 call, he had probable cause to arrest Davis for the crime of Intimidation. In Indiana, a person who communicates a threat with the intent (1) that another person engage in conduct against the other person's will [or] that another person be placed in fear of retaliation for a prior lawful act, commits Intimidation (which is a Class A Misdemeanor). Ind. Code § 35-45-2-1. However, the offense is raised to a Level 6

9

felony if the threat is to commit a "forcible felony," which is a "felony that involves the use or threat of force against a human being, or in which there is imminent danger of bodily injury to a human being." *Id.*; Ind. Code § 35-31.5-2-138. Carter testified on the stand during the hearing that she told Officer VonBank she got "threats from Michael [Davis] that he was going to kill my baby." [DE 62 at 38-39.] That clearly rises to the level of a "forcible felony." Moreover, Carter's daughter told the 911 operator she was scared for her safety and that Davis had threatened her mother and unborn child. Much of what she said in the 911 call was later confirmed by Sgt. Manuel on the scene. Based on the facts known to Sgt. Manuel, I find that there was probable cause to arrest Davis on the roadside.

Following Davis' detainment, the search was permissible under the automobile exception. A search is permitted where there is probable cause to believe a vehicle contains evidence of criminal activity. *See United States v. Seymour*, 519 F.3d 700, 713 (7th Cir. 2008). "Probable cause exists when based on the known facts and circumstances, a reasonably prudent person would believe that contraband or evidence of a crime will be found in the place to be searched." *Charles*, 801 F.3d at 860 (7th Cir. 2015) (finding search of car proper under automobile exception where caller reported to police a man had pounded on her car window and had a gun, because a reasonable officer would have considered it likely the defendant "had stashed the gun - evidence of these crimes - in the car.").

In this case, it was permissible for Manuel to search Davis' vehicle because he

had probable cause to believe the car contained a gun, which is certainly evidence of criminal activity — in particular, it's evidence of the offense of Intimidation under Indiana state law.  As noted above, Manuel had received a report from dispatch detailing that Davis had threatened to kill Carter's baby (she was pregnant so obviously this threat puts her at risk as well), and that Davis had a firearm in his car.  The vehicle that was pulled over about a block from Carter's house matched the description of the vehicle that Carter's daughter had told the 911 operator.  And regardless of whether Officer VonBank talked with Carter at the scene (when she confirmed the threats) before or after Manuel actually arrested him, Manuel had probable cause to believe that the car contained evidence of criminal activity (an assault rifle).

Davis argues in his supplemental memorandum that the information obtained from the 911 call does not, standing along, provide enough information to establish probable cause to support Davis' arrest. [DE 58 at 2.]  But cases like *Charles* show otherwise.  He also claims it is "undisputed that Sergeant Manuel arrested Davis on the public street before Gary Police Officer Vonbank . . . had obtained information from the victim to corroborate the alleged threats that had been reported by the 15 year-old during the 911 call" and the officers should have investigated more before they arrested him. [*Id.* at 4.]  As I mentioned before, there is conflicting testimony on this point.  According to Officer Vonbank, after he returned from talking to Carter, Davis had already been arrested and was already being taken to the station. [DE 61 at 106.]  But according to Manuel, he didn't arrest Davis until after Vonbank talked to the victim and

11

decided she wanted to press charges. [*Id.* at 61, 86, 90-91.]  But even taking the evidence in the light most favorable to Davis, and assuming that Officer Vonbank talked to Carter at the scene *after* Davis was technically arrested and placed in the squad car, this still does not poison the search because Sgt. Manuel had probable cause anyway.

"The complaint of a single witness or putative victim alone generally is sufficient to establish probable cause to arrest unless the complaint would lead a reasonable officer to be suspicious, in which case the officer has a further duty to investigate." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 743 (7th Cir. 2003) (citations omitted). "And in crediting the complaint of a reasonably believable witness or putative victim, the police are under no constitutional obligation to exclude all suggestions that the witness or victim is not telling the truth."  *Id.*  Put another way, "once a putative victim . . . has positively identified her attacker to police and they have no reason to disbelieve her, the officers need not take any additional steps to corroborate the information regarding the crime before taking action."  *Tangwall v. Stuckey*, 135 F.3d 510, 516 (7th Cir. 1998) (quotation marks and citation omitted).  In those circumstances, "[t]he identification itself establishes probable cause to make an arrest."  *Id.*

Here, Carter's 15 year old daughter placed the 911 call that was played in court during the hearing.  She was coherent, urgent, able to communicate and answer all questions, old enough to understand the consequences of her actions, described in detail Davis' car, and was very specific that Davis was outside, had threatened her mother, and had an assault rifle in his car.  Near the end of the conversation, Carter

12

herself got on the phone and was equally upset and fearful. I see no reason at all for officers to be suspicious of the information conveyed in the 911 call, much of which was corroborated on the scene.

Davis also contends that any probable cause to arrest Davis dissipated during the interval between the 911 call and Davis' arrest, arguing that when Officer Manuel got to Carter's house and didn't see anyone, the matter was essentially closed. [DE 61 at 9-10, DE 62 at 82-85.] I completely disagree with this argument. "The mere passage of time does not necessarily dissipate the probable cause for an arrest. It is well-established that there is no requirement that an offender be arrested the moment probable cause is established." *United States v. Haldorson*, 941 F.3d 284, 291 (7th Cir. 2019) (citations and quotations omitted). Here, the 911 call was placed at approximately 7:12 a.m., and dispatch transmitted the information to officers via the CAD system starting at 7:13 a.m. [DE 34-1 at 14.] Davis was arrested around 7:30 -7:34 a.m. [*Id.* at 15.] That is a mere 20 minutes after the chilling 911 call was placed by Carter's daughter. There is no way that probable cause to arrest Davis dissipated in this short of a time frame. Moreover, he and Carter were found on the road, just a short distance from Carter's residence.

Nothing in *People v. Quarles*, 410 N.E.2d 497 (Ill. App. Ct. 1980), a case relied upon by Davis, commands a different result.[DE 58 at 9-10.] It is true that in *Quarles*, the court found that probable cause had dissipated. But it made that finding because additional information, or intervening facts, that became known to the officers negated the probable cause. Defendant was arrested for attempted burglary, but police later

13

learned that the defendant was permitted to live in that apartment, so there was no longer probable cause for an attempted burglary charge. *Quarles,* 410 N.E.2d at 499. In this case, there was probable cause based on the 911 call that Davis had committed the crime of Intimidation. No intervening facts negated this probable cause in the short time between the 911 call and when Davis was apprehended/arrested.

In addition to the validity of the search in accordance with the automobile exception, the search was also justified under the search incident to arrest exception. When the police arrest an occupant of a vehicle, "the circumstances unique to the automobile context justify a search incident to arrest when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle." *Arizona v. Gant*, 556 U.S. at 335. "Police may search a vehicle incident to a recent occupant's arrest only if the arresstee is within reaching distance of the passenger compartment at the time of the search *or* it is reasonable to believe the vehicle contains evidence of the offense of arrest." *Id.* at 351 (emphasis added). Davis was in handcuffs, so he wasn't within reaching distance of the gun, but Manuel did have good reason to believe that Davis' vehicle had evidence of the offense of his arrest for Intimidation. Carter's daughter called 911 and told the operator that Davis had an assault rifle in the car with this description, and this information was passed on to the officers via the CAD report and radio dispatch.

Finally, I note that the discovery of the gun in this case was inevitable because, once it was determined that Davis would be arrested and his car would need to be

towed from the side of the road, the officers were entitled to conduct an inventory search in preparation of the car being towed to the impound lot.  According to Officer Vonbank, the Gary Police Department has a vehicle inventory and tow policy, and the inventory search and tow in this case was completed pursuant to that policy. [DE 61 at 106-07.]  "Inventory searches are a recognized exception to the warrant and probable-cause requirements of the Fourth Amendment." *United States v. Cherry*, 436 F.3d 769, 772 (7th Cir. 2006).  Inventory searches are permissible "to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger." *United States v. Duguay*, 93 F.3d 346, 352 (7th Cir. 1996) (quotation marks and citation omitted).  In this case, the victim reported that Davis had an assault rifle in his car.  Therefore, in addition to the valid search of the car under the automobile exception and incident to arrest, the police also had a valid safety interest before towing it to an impound lot to make sure it was safe for them and the tow company. Thus, the gun would have been inevitably discovered by the police in an inventory search. *United States v. Stotler*, 591 F.3d 935, 940 (7th Cir. 2010).

      For all of these reasons, it is clear that the search of Davis' car was valid.  It is proper under any (and all) of the exceptions to the Fourth Amendment warrant requirement discussed above: the automobile exception, a search incident to arrest, and the inevitable discovery doctrine.  As such, the weapon found in Davis' car is admissible evidence at trial, and any statements he made thereafter at the station after

15

he was read his *Miranda* rights are equally admissible. The only suppression argument Davis makes relating to his statements is that they were fruits of a poisonous search of his car. [DE 34 at 11.] But because the search was entirely valid, there is no basis to suppress the statements.

## Conclusion

For all of the above reasons, Davis' Motion to Suppress [DE 34] is DENIED.

SO ORDERED.

ENTERED: September 13, 2022.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT